George J. Kolowich v. Commissioner.
Kolowich v. Commissioner
Docket No. 109351.
United States Tax Court
1943 Tax Ct. Memo LEXIS 520; 1 T.C.M. (CCH) 416; T.C.M. (RIA) 43026; January 9, 1943
*520 William C. Allee, Esq., and Lyall F. Martz, Esq., 1820 Union Guardian Bldg., Detroit, Mich., for the petitioner. Melvin S. Huffaker, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner made several adjustments to the net income shown by petitioner's return for the calendar year 1939 and determined a deficiency in income tax in the amount of $2,528.48. The petition alleges that he erred in making the several adjustments and also that petitioner should be allowed an additional deduction of $3,600 not claimed in his return. At the hearing petitioner waived three assignments of error. The issues requiring determination are whether respondent erred: (1) in increasing income for personal services by $10,822.75; (2) in disallowing an alleged long-term capital loss of $1,902; (3) in disallowing an alleged ordinary loss of $6,891.46 resulting from the foreclosure of a mortgage upon real estate; and (4) "in not considering sales expense in the amount of $3,600 which the petitioner asserts as an affirmative issue." Issue I Findings of Fact Petitioner, a resident of Wayne County, Michigan, filed his income tax returns for 1938 and *521 1939 with the collector of internal revenue for the district of Michigan. They were made on the cash basis. In the return for 1938 petitioner reported the receipt of salaries and other compensation for personal services aggregating $25,000. This was comprised of a drawing account of $3,000 actually paid to him in cash in monthly installments and $22,000 representing the amount agreed to be paid to him by the Detroit Housing Corporation in connection with the "supervision and sales management" of 44 houses at the rate of $500 per house. He reported a loss of $622.28 from the sale of an 8 room house and boat house, a loss of $34,020 from the sale of St. Clair Shore bonds (50 percent or $17,010 as a capital loss), and deductions aggregating $8,236.50. The return showed no net income but instead a loss of $868.78 and no tax due. In the return for 1939 petitioner reported salaries and other compensation for personal services rendered to the Detroit Housing Corporation aggregating $17,000. This was comprised of a drawing account of $3,000 paid to him monthly in cash and $14,000 representing the amount agreed to be paid to him by the corporation in connection with 28 houses under the same *522 circumstances as set out in the preceding paragraph. He reported a loss of $158.50 from the sale of a boat house, a loss of $668.20 from the sale of stocks, a loss of $3,650 (50 percent or $1,825 as a capital loss) from the sale of St. Clair Shore bonds, a loss of $3,804 (50 percent or $1,902 as a capital loss) in connection with the foreclosure of a mortgage on "New Baltimore house" and an additional ordinary loss in connection with the foreclosure of a mortgage on the same property in the amount of $6,891.46. The total income was further reduced by allowable deductions, exemptions and credits for dependents and petitioner paid a tax of $10.05. The Detroit Housing Corporation (hereinafter sometimes referred to as the corporation) has been organized at some undisclosed time prior to January 1, 1938. It owned some land suitable for development through the construction of small homes. The total amount of its authorized stock is not shown. Petitioner's wife owned a substantial block of its preferred and common stock. She was its secretary, John C. Finan was its president and they, together with petitioner, constituted the executive committee of the board of directors. The other directors *523 were A. Lark and John Hopkins. Hopkins was comptroller. At a special meeting of the board of directors of the corporation held on February 8, 1938, and attended by Finan, petitioner and his wife it was stated that the corporation had set up a building program to build approximately 100 homes on the property being developed by it. It was resolved: In addition to their regular salaries, the corporation shall pay to George J. Kolowich the sum of Five Hundred Dollars ($500.00) per house for supervision and sales management, to John C. Finan the sum of One Hundred Twenty-five Dollars ($125.00) per house for overseeing purchases and assisting in building and financial supervision; and to Irene G. Kolowich the sum of Forty Dollars ($40.00) per house for general work relative to applications, inspections and finance and closing sales. The above amount is to be paid in December of each year or at any other time that it may be mutually agreed. During the year 1938 the corporation constructed and petitioner sold 44 homes financed by the F.H.A. In general the building program was carried out substantially as follows: A commitment to make a loan would be secured from a prospective mortgagee *524 and the construction of a house would then be started. While it was being constructed the F.H.A. made various inspections and, upon completion and final inspection, agreed to insure the loan. A down payment would be secured from the purchaser and a mortgage would be placed upon the property in an amount usually more than sufficient to take care of the total expense of building the house. The gross profit to the corporation on the houses built and sold during 1938 averaged, exclusive of supervision and sales management, approximately $1,000 per house, the total profit from the sales made during that year aggregating $41,656.64. The $300 per house specified to be paid to petitioner for supervision and sales management was not paid. He had no power to sign checks and the funds of the corporation could be paid out only upon checks signed by two of the following, i.e., Finan, Mrs. Kolowich and John Hopkins. The financial statement of the corporation as of December 31, 1938, is as follows: ASSETS
Cash on Hand, in Bank & Sinking Fund
$ 20,330.36
Investments (Stock & Bonds - Market)
38,651.00
Buildings under Construction - Net
69,483.66
Notes Receivable
2,970.95
Accounts Receivable
601.65
Mortgages Receivable - 2nd Mortgages
$ 5,824.79
Less Reserve
4,719.55
1,105.24
Lend Contracts Receivable
202,668.46
* 72,223.59
* 130,444.87
Real Estate Owned & Held for Resale
$610,623.86
Less Reserve
116,528.84
494,095.02
Depreciation
* 43,095.39
* 450,999.63
Furniture & Fixtures
$ 5,422.60
Less Depreciation
5,104.93
317.67
$830,224.02
LIABILITIES
Notes Payable - Bank
$ 11,850.00
Accounts Payable
Franchise & Personal Taxes - General Taxes, etc
4,326.91
Trust Funds & Deposits
942.50
Interest Payable
5,595.02
Construction Supervision Payable on bldge. as completed
4,045.40
Land Contracts Payable
39,427.92
Mortgages & Bonds Payable
$426,324.04
Payable to Officers & Directors
77,537.35
Capital Stock - Preferred 45,248.30 shs. at $1 Par * 39 1/2%
Common 49,293.33 shs. at.10 Par * 40%
50,177.63
Reserve & Unrealized Profits on Land Contracts
72,233.59
Surplus & Additional Reserve
137,773.66
$830,234.02
* 72,223.59
* 758,000.43
* 43,095.39
* 714,905.04
Surplus Red
* 769.14
* 714,135.90
*525 On December 20, 1938, the corporation caused a journal entry to be prepared crediting to petitioner the sum of $22,000 "for services covering properties listed below". (Listing the 44 pieces of property.) St. Clair Shores Municipal bonds, having a cost basis to petitioner according to his income tax return of $71,820, had been sold by him to the corporation for $37,800; but no part of the agreed purchase price had been paid to him. (The details of this transaction are not shown.) Petitioner's account with the corporation at the end of the calendar year 1938 showed two credit entries, one under date of November 15 in the amount of $37,800 and one under date of December 20 in the amount of $22,000. The aggregate of these two amounts ($59,800) was transferred to the general ledger of the corporation on December 31, 1938. The journal entry of December 20, 1938, was made pursuant to the action taken by the executive committee on February 8, 1938, set out in the findings above and no subsequent meeting of the board of directors was held at which instructions *526 were given with reference to making any particular entries. Petitioner told the comptroller of the company how he "wanted to dispose of the thing" and "that he was to credit my (petitioner's) account, accounts payable." Petitioner did not anticipate drawing the money out immediately, and none of it was withdrawn during 1938. During the year 1939 the following withdrawals were made by petitioner: July 31
$ 9,000.00
August 31
10,600.00
September 30
10,000.00
November 30
23,022.75
December 31
10,000.00
$62,622.75
During the same period the following credits were made to his account on the books of the corporation: August 31
$ 1,122.75
November 30
5,000.00
December 31
6,000.00
December 31
14,000.00 The withdrawals were in cash. The credit of $14,000 on December 31 represented commissions of $500 each in connection with the supervision and sales management of 28 houses. The details of the other credit entries are not shown. The corporation had a line of credit at a local bank of $20,000, and notes or other indebtedness of the corporation aggregating that amount could be signed by two of the following: Finan, Hopkins and Irene G. Kolowich. The record does *527 not indicate whether the bank loans outstanding at the end of the year 1938 ($11,850) were, or were not owing to the same bank which had extended the $20,000 line of credit. The $10,822.75 additional income included by respondent in petitioner's 1939 return was determined as follows: 1938 Commissions credit
$22,000.00
1938 Bonds sold
37,800.00
Due December 31, 1938
$59,800.00
1939 Commissions credited
14,000.00
Total credits
$73,800.00
Amount paid to petitioner in 1939
$62,622.75
Amount applicable to bonds
37,800.00
Taxable 1939 commissions
$24,822.75
Reported 1939 commissions
14,000.00
Additional 1939 income
$10,822.75
Opinion Upon brief the parties discuss at length what has sometimes been referred to as the doctrine or "fiction" of constructive receipt. In essence it is that one is deemed to be in receipt of income when, under the facts, the actual reducing of it to possession is contingent only upon his own will. The regulations [1] recognize as a prerequisite that the "income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and *528 must be made available to him so that it may be drawn at any time * * *." Substantially the same language has been used by the courts and the Board of Tax Appeals in numerous cases, some of which are cited by the parties. John A. Brander, 3 B.T.A. 231; Ella C. Loose, Executrix, 15 B.T.A. 169; Burns et al. v. Commissioner, 31 Fed. (2d) 399; Hadley v. Commissioner, 36 Fed. (2d) 543. But the doctrine of constructive receipt is to be sparingly applied, Cox Motor Sales Co., 42 B.T.A. 192, and the mere posting of a credit to the taxpayer's account or even the issuance of notes for an unpaid liability is not sufficient to justify its application. It has been suggested that perhaps it should never be "applied to the recipient's advantage because to do so would be contrary to the purpose of the rule" ( Sanford Corporation, 38 B.T.A. 139, affd., 106 Fed. (2d) 882, certiorari denied, 309 U.S. 659): but decision in this case will not be rested on that *529 theory.
The facts need not be reviewed at length. Petitioner insists that the corporation's assets "were more than sufficient to satisfy the petitioner's account in event that he desired to withdraw the funds subsequent to December 20, 1938, and prior to the close of the year." He points to the balance sheet showing "cash on hand, in Bank & Sinking Fund 20,330.26 *, * investments in stocks and bonds with a market value of $38,631 and other substantial assets and a bank credit of $25,000," which, he says, were more than sufficient to satisfy his account. This argument, under the circumstances here present, is not persuasive. A portion of the cash in the sinking fund - the amount is not shown - was no doubt placed there for the purpose of retiring the corporation's bonds. According to the financial statement the corporation's mortgages and bonds payable amounted to $426,324.04. Its investment in stocks and bonds was not necessarily worth the amount carried on its books. Most of them had been purchased from petitioner in 1938, as a result of which he had been enabled to take a $34,000 loss representing 48 percent of their cost to him. In this *530 connection it is noted that during the year 1939 he sold some of the same bonds to the corporation, taking a loss equivalent to 55 percent of his cost basis. Likewise questionable is the value of the bank credit of $25,000, which petitioner says the corporation had though which other evidence indicates was only $20,000. In this connection it is noted that the corporation was already indebted to banks in the amount of $11,850 and in addition was indebted to its officers and directors in the amount of $77,537.35. Under the circumstances, therefore, it cannot be found as a fact that merely because the amount was credited to petitioner's account upon the corporation's books, he, keeping such records as he kept and making his returns on the cash basis, should report it in his income for 1938. Passing the abstract question of the possible solvency of the corporation and dealing with other phases of the case, it seems to be obvious that the "intimacy of the family relationship" would have been, and was, a substantial deterrent to the withdrawal of such a substantial sum by petitioner between December 20th and December 31st, 1938. In this connection it may be pointed out that petitioner's *531 wife owned a large portion of the corporation's common and preferred stock. The record is not clear as to how much she actually owned. Petitioner stated that she owned approximately 39 percent. It is possible this may have referred to the total issued stock and that she - as is somewhat suggested by pencil notations appearing upon the financial statement - may have owned practically all of the outstanding stock. If so, probably she would have been reluctant to permit him to withdraw all that the corporation could have scraped together, especially since, as he stated, he "did not need it." But however that may be the affirmative action of at least two of the officers of the company was required to make any portion of the money actually available to petitioner and none of it was made available to him. Under the circumstances, therefore, he cannot be said to have been in constructive receipt of the $22,000 in 1938. Respondent's computation seems to be eminently fair to the taxpayer. Petitioner, by his own statements, has shown that he was entitled to receive in 1939 commissions in the aggregate amount of $36,000. He actually received $62,623.75, $37,800 of which respondent has allocated *532 to the indebtedness for the bonds, which had been sold to the corporation. This left $24,822.75 which respondent credited to commissions, though he might have argued that the whole $36,000 of commissions had actually been paid. Petitioner concedes that he actually received $62,622.75 during 1939 and that he was on the cash basis. Under the circumstances we think that the commissioner did not err in including the $10,822.75 in issue in petitioner's return for 1939. We have deliberately refrained from making some of the findings requested by petitioner. Testifying as a witness he stated that he had the right to withdraw the money at any time, that he used the corporation merely as a bank, that he had discussed the whole matter with his wife and Finan about December 1, 1938, and that they understood he could withdraw the money at any time. Both Finan and petitioner's wife testified briefly but neither substantiated his statements in this particular nor were they asked any questions bearing on the subject. His statement that they understood he could withdraw the money at any time was a mere conclusion. His contention that he "used the corporation merely as a bank" is unsupported by the *533 evidence. So far as the record shows he withdrew nothing during 1938 except his salary of $3,000 and $600 as automobile expense. Then, too, there are certain inaccuracies in his testimony which are wholly unexplained. Thus at one juncture (R. 89) he stated that he was the president of the corporation in 1938. Exhibits introduced in evidence show, however, that Finan was its president on February 28, 1938, and no subsequent meeting of the board of directors, at which officers were elected, is shown. The corporation records contain numerous erasures and respondent, upon brief, makes much of the fact that the minutes of the corporation of February 8, 1938 (Ex. 1), set out in the findings, may contain a sentence added after they were written up. In this connection he points out that the entire paragraph, except the last sentence, appears within quotation marks, whereas the last line, upon which petitioner places substantial reliance, is not embraced within the quotation marks. We need not find, nor do we find, that the erasures were aught than corrections of mistakes; nor is there any evidence - other than that referred to - indicating that the corporation's records were changed. But *534 giving full effect to them, we are not convinced that respondent erred in determining that petitioner's income from commissions was $24,822.75 rather than $14,000 as reported by him. This issue is therefore decided against petitioner. Issues II and III Findings of Fact In 1927 petitioner purchased a piece of property at New Baltimore (23 miles from Detroit) having a lake frontage of 150 feet and a depth of 350 feet with an old building on it. The building had no value and was torn down shortly thereafter. Petitioner then erected a new home at a cost of $8,000. In 1928 he expended an additional $6,400 on the house for a new basement, a heating refrigerator plant, built a sea wall, dock and garage and made other improvements to the property at a total cost of $1,400. In 1934 petitioner concluded that he could not afford to keep that type of property for himself and placed a "For Rent" sign on it. He had moved out of the property in 1933. The property was rented once for a week and at a later date for a period of two weeks. Petitioner received a total of $50 net from rental of the property, an additional $50 having been paid to a real estate agent as a commission for securing *535 a tenant who never paid any additional amount and who moved out after occupying the property for only a brief time. In 1932 there was an unpaid mortgage on the property amounting to "approximately $6,000 or $7,000." Petitioner had been declared a bankrupt and had also been indicted for a violation of the criminal laws of the state at some undisclosed time, apparently between 1930 and 1932. In the schedules filed by him in the bankruptcy proceeding the lake front property was not listed as an asset. Petitioner contended that it was exempt as a homestead. After being examined at length by creditors and other interested parties in the bankruptcy court, his claim for exemption of the property as a homestead was denied. The trustee did not take possession of the real estate or attempt to sell it but (in the language of petitioner) "abandoned" it. Thereafter petitioner made an effort to refinance the property with an H.O.L.C. loan. A tentative commitment was granted for an amount equivalent to the outstanding loan, less $1,500; but local counsel refused to approve the making of a loan to petitioner, since he was, at that time, under indictment in the state courts and a bankrupt. Petitioner, *536 however, conveyed the property to his wife, paid $1,500 toward the reduction of the indebtedness, the H.O.L.C. placed a mortgage upon the property for the balance, and the wife reconveyed the property to petitioner. In 1938 the H.O.L.C. instituted proceedings to foreclose its mortgage, the principal sum then due being $6,174.48. Inferentially it appears (5 E-4, petition) that the expiration date in connection with the mortgage foreclosure sale was October 24, 1939; but no redemption was made. In petitioner's income tax return for the year 1939 he claimed a capital loss of $3,804 and that 50 percent of the amount, or $1,902, was deductible as a long term loss. He also claimed an ordinary loss in the amount of $6,891.46, computing the losses as follows: LOT - New Baltimore House - Acquired 1927
H.O.L.C. foreclosed - redemption date Oct. 24, 1939. Lot
valued at date acquired $13,000.00.
Lot revalued in 1934 for rental purpose
$6,000.00
Less.356% of mtg. prin. balance due to H.O.L.C. of $6,174.48
2,196.00
Loss
$ 3,804.00
50% allowable
$1,902.00
HOUSE & IMPROVEMENTS - On above lot acquired 1927
$2,000.00, plus improvements in 1928 - $6,400.00
Garage, fence, docks, etc., in 1930 - $1,400.00
With lot (as shown above) $13,000.00 total cost to 1930 -
$28,800.00
Re-Valued in Sept. 1934
(Lot as shown above $6,000.00)
Buildings
$10,000.00
Improvements
2,500.00
$12,500.00
Less depreciation taken in 1937 - $400.00
Less depreciation taken in 1938 - $400.00
Less windstorm loss in 1938 - not
covered by insurance - deducted
in 1938
631.20
Depreciation already taken
1,431.20
Total net cost as of 1939
10,869.80
Less principal amount due on H.O.L.C. mtg. which was foreclosed and not
redeemed in Oct. 1939 of $6,174.48 -.644% of $6,174.48
3,978.34
Total net loss from foreclosed property other than capital asset
$6,891.46
*537 The Commissioner determined that the evidence did not substantiate the fair market value of the former residence property allocated to the lot and to the improvements at the time the property was converted to business purposes and that it did not appear that the property was used in a trade or business. He therefore disallowed both deductions. The correctness of his action is placed in issue by assignments of error 4 (c) and 4 (e) in the petition. The total value of the real estate in 1934 was $9,000, 35 percentum of which was attributable to the land the remainder to the improvements. The property was appropriated to income producing purposes in 1934. Opinion Section 23 of the Internal Revenue Code authorizes the deduction of losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business or in any transaction entered into for profit, though not connected with the trade or business. Section 117 defines capital assets as property held by the taxpayer, but not including property used in the trade or business of a character which is subject to allowance for depreciation. It was settled by Heiner v. Tindle & Union Tr. Co. of Pittsburgh, 276 U.S. 582, *538 that an individual taxpayer sustains a deductible loss through the sale, for less than his cost basis, of property originally acquired as a residence but later converted into business property. The regulations implement the rule of the cited case, Article 23 (e) - 1 of Regulations 101 providing that if property purchased or constructed for use as a residence is, prior to its sale, "rented or otherwise appropriated to income-producing purposes and is used for such purposes up to the time of its sale, a loss * * * computed as provided in section III, is, subject to the limitations provided in section 117, an allowable deduction in an amount not to exceed the excess of the value of the property at the time it was appropriated to income-producing purposes (with proper adjustments for depreciation) over the amount realized from the sale." The Treasury Department has ruled (I.T. 3217, C.B. 1938-2, p. 94; I.T. 3246, C.B. 1939-1, p. 137), and the rulings appear to be in accordance with the law and decisions of ( George S. Jephson, 37 B.T.A. 1117; John D. Fackler, 45 B.T.A. 708, on appeal 6 C.C.A. * ; Report of Committee *539 on Ways and Means No. 1860, 75th Congress, Third Session), that "the gain derived or the loss sustained upon the sale of improved property used in trade or business constitutes a capital gain or loss in so far as such gain or loss is allocable to the land and an ordinary gain or loss in so far as allocable to the depreciable improvements." (I.T. 3217, supra.) Also that "in applying section 117 * * * to a sale or other disposition of real estate consisting of land and improvements, the net proceeds of sale should be apportioned on the basis of the value of the land, and the value of the depreciable improvements on the date of the sale." (I.T. 3246, supra.) It is apparent petitioner endeavored to compute his capital and ordinary loss in accordance with the above rulings. It also inferentially appears - the records were not introduced in evidence but no controversy upon this point seemed to exist at the hearing - that the foreclosure and sale occurred in 1938 and the period of redemption expired in 1939. The loss, if any, was therefore, deductible in the latter year. Derby Realty Corporation, 35 B.T.A. 335, *540 appeal 6 C.C.A. dismissed; Shelden Land Co., 42 B.T.A. 498; G.C.M. 19367, C.B. 1937-2, p. 115. But while the present issues are to be resolved in favor of the petitioner the facts do not justify approval of the computations used by him in his return. Petitioner, testifying as a witness, expressed the opinion that in 1934 the land was worth $6,000 and the buildings and other improvements were worth $12,500, a total of $18,500. This was the only evidence adduced upon the subject. In the opening statement his counsel stated: * * * Now, in 1930, the market had fallen off from real estate. Offers to sell this property and other properties were made. The trustee in bankruptcy finds himself in a position where there are no bids. The trustee in bankruptcy must close his trust business. Where there is no equity in the real estate in question, either for the bankrupt estate or for the bankrupt, practice in this district is to abandon the property, and this property was so abandoned by order of the court. Now, that the judgment of the trustee in bankruptcy was correct is manifest by the history of the property. I expect to show *541 that subsequent to the bankruptcy, in 1934, I believe, the mortgage was refinanced with the Home Owners Loan Corporation. Now, that there was no equity in there is apparent by the fact that you couldn't get any tenant, and that the property was finally foreclosed and there was no equity salvaged out of it by the petitioner here, the there bankrupt, so that if the history of the impact of the bankruptcy and this petition upon the property * * *. Statement of counsel, of course, does not constitute evidence; nor has the portion set out above been accepted as such. It emphasizes the difficulty that triers of the facts experience, however, in attempting to determine the fair market value of real estate which they have never seen. Notwithstanding petitioner's testimony, we are reluctant to accept his appraisal; for there are too many circumstances indicating that he was too sanguine. Thus, we think it may be assumed that a trustee in bankruptcy would not have "abandoned" a piece of property having a value of $18,500 merely because it was encumbered with a mortgage of "between $6,000 and $7,000." It may also fairly be assumed that appraisers representing the H.O.L.C. would not have required *542 the payment by petitioner of $1,600 before agreeing to make a loan sufficient to liquidate the indebtedness secured by the mortgage if the property had an actual fair market value of $18,500 - the principal amount of the mortgage taken by the H.O.L.C. was not shown but was apparently between $6,000 and $7,000 - and we take judicial notice of the fact that the H.O.L.C., which was organized for the purpose of benefiting distressed home owners (12 U.S.C.A. 1461, et seq.) adopted a liberal policy toward them. The act by its terms limited the face value of the bonds and the cash to be advanced by the H.O.L.C. to an individual to $14,000 "or 80 percentum of the value of the real estate as determined by an appraisal made by the corporation, whichever is the smaller." If the loan was, say $6,500, that would indicate that the appraisers valued the property at approximately $8,000. The evidence of value is far from satisfactory but we are of the opinion that it was not in excess of $9,000 in 1934 and we have so held. The portion of the total allocable to the land was, in our judgment, 35 percentum and to the buildings 65 percentum. We therefore compute *543 petitioner's capital and ordinary loss, as outlined in I.T. 3246, supra, as follows: Value of land
$3,150.00
Less 35% of mortgage
2,161.17
Loss
988.93
50% allowable as a capital
loss. Sec. 117
$494.46
Value of improvements
5,850.00
Less depreciation at
3% for 1934, 1935,
1936, 1937 and
1938
$877.50
Windstorm loss in
1938. Not cov-
ered by insur-
ance. Deducted
and allowed
(see Ex. A)
831.20
1,708.70
$4,141.30
Less 65% of mortgage
4,013.41
Ordinary loss allowable
$127.89
Issue IV In petitioner's return for the year 1939 he included the sum of $600 paid to him by the corporation for "car and travel expense", and deducted the same amount as an expense. Similar entries were made in the 1938 return. In the petition it is alleged that: Petitioner incurred sales promotion and selling expenses in the sum of $3,600. These expenses, which were omitted as deductions in the 1939 income tax return were ordinary and necessary in the course of business for which there was no additional reimbursement. This allegation is denied in the respondent's answer. In lieu of findings of fact we set out at this juncture the evidence pertaining to this *544 issue. Petitioner testified that he had certain expenses in connection with making the sales which were not reimbursed to him by the company. He stated: The expenses of a man that has charge of supervision and sales consists of a large amount of automobile expenses, telephone calls, entertainment; also I maintain men on the houses to display the houses and put up "for sale" signs, electric lights, different types of inducements to attract sales. When asked to estimate the expenses which he had during the year 1939 he said: A. Around $3,600, between $3,600 and $4,000. Q. How did you arrive at that figure? A. I arrived at it on the basis of approximately $300 a month. Q. Have you got any receipts or checks to justify that figure? A. No, I have not. I dealt in cash. The men that I have working for me I would pay them the $2 or $3 a day that they would be getting for display purposes, and entertainment on the same basis. It was all on a cash basis. Under cross-examination petitioner was asked whether he had anything of any nature to show with respect to the sales expenses, to which he responded - No, I did not, except that the income, in addition to the unit income that I was *545 receiving from the Detroit Housing Corporation, was more than absorbed each month in my expenses and that's how I arrived at my expenses. In other words, the compensation that I received from the Detroit Housing Corporation was used up for the incidental expenses and you just - if there's a question in your mind, just estimate a sale of about $300,000, 44 houses, supervising them, hiring and firing help and hiring salesmen and - I feel that you will agree with me that the expense of $300 a month is very small. (Parenthetically it may be observed that 28 houses were sold by petitioner during 1939 rather than 44 houses.) Opinion Section 23 of the Internal Revenue Code permits the deduction from gross income of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." This term has been defined in numerous decisions. See Kornhauser v. United States, 276 U.S. 145; Deputy v. du Pont, 308 U.S. 488; Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326. Petitioner relies upon the language used in Cohan v. Commissioner, 39 Fed. (2d) 540: *546 Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close o should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. It is not fatal that the result will inevitably be speculative. The quoted language has been applied in many cases and should now be followed. So far as automobile expense is concerned we think it may be assumed that the $600 paid by the corporation to petitioner was ample. In this connection it is also noted that the corporation appears to have expanded $475 for "auto Equipment" during the year 1938 and $1,649.20 for auto expense in the year 1939. Assuming that this includes the $600 paid to petitioner it would seem that the corporation expended an additional $1,049.20. During the same time it paid an average of approximately $25 per month for electric lights, telephone and telegraph bills aggregating $368.49, and advertising amounting to $1,082.24. It is reasonable to conclude, as we do, that the corporation paid all of the expenses for automobiles, electric lights, telephones, telegraph and advertising in connection with the sales *547 made in 1939. We can only speculate as to the amount expended by petitioner for entertainment and for "maintaining men on the houses to display the houses and put up 'For Sale' signs, etc." The aggregate probably did not exceed $25 per month or a total of $300. This amount is therefore allowed as an additional deduction from 1939 gross income. Decision will be entered under Rule 50. Footnotes
*. The figures shown in pen and ink are shown in pencil on the exhibit received in evidence, (Ex. 5) but are not otherwise explained.↩
1. Art. 42-2, 42-3, Regulations 101.↩
*. BTA decision affirmed by CCA-6, 133 Fed. (2d) 509↩,